IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| ATLAS PARTNERS II, LIMITED PARTNERSHIP, and 1123, LLC, | Case No. 4:05CV00001 |
| Plaintiffs, | **MEMORANDUM OPINION** |
| v. | |
| BRUMBERG, MACKEY & WALL, PLC and MARK A. BLACK, | By: Jackson L. Kiser<br>Senior United States District Judge |
| Defendants. | |

Before me now is Defendants' Brumberg, Mackey & Wall, PLC and Mark A. Black's ("BMW" and "Black" or, collectively, "Defendants") Motion for Summary Judgment as to all five counts in Plaintiffs' Atlas Partners II, LP and 1123, LLC's (collectively, "Plaintiffs") Complaint. The parties have briefed the issues and oral argument was held on December 2, 2005. The motion is therefore ripe for decision. For the reasons stated herein, Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

## I.  STANDARD OF REVIEW

Summary judgment is appropriate where no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). A genuine issue of a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

1

247-48 (1986).  In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party."  *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1129 (4th Cir. 1987).  Nevertheless, where the record taken as a whole cannot lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial and summary judgment is appropriate.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Additionally, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252.

## II.  STATEMENT OF THE CASE

At the summary judgment stage I must view the evidence in the light most favorable to Plaintiffs, the non-moving party.  In this light, the evidence shows that Atlas Partners II, Limited Partnership ("Atlas") was reorganized on February 1, 1999 to allow its limited partners the option of investing in hedge funds, private equity investments (PEIs), or a combination of the two.  Though he was not the general partner, Robert Jordan ("Jordan") was vested with authority by the general partner to carry out duties and responsibilities normally reserved to the general partner regarding the PEIs; at all times Jordan remained subject to the general partner's authority and control.  This delegation was consistent with Section 2.2 of the Partnership Agreement.  Jordan was thus authorized to, *inter alia*, hire attorneys to further Atlas' PEIs and to have discretionary management over the Fund's assets with regard to the PEIs.  *Id*.

Beginning in late 1998 and in accordance with his delegated authority, Jordan used

2

BMW to set up and facilitate Atlas' PEI transactions. Jordan had been acquainted with Nelson Mackey ("Mackey") of BMW since at least 1992. The first limited liability company (LLC) BMW set up to facilitate Atlas' PEIs was Emma's Sled - Seneca I, LLC in November of 1998. Simultaneous to this action, BMW also set up Fedd Credit Fund, LLC ("Fedd Credit") for Jordan. Fedd Credit was owned by Jordan and his wife and was created to advance money for Atlas' PEIs until Atlas could obtain the funds necessary to repay certain loans and fund the PEI transactions itself.

Later, in January 1999, Jordan again went to BMW to have it form 1123, LLC. BMW prepared 1123, LLC's Operating Agreement and the Certificate of Formation. As with all the other PEIs, which are discussed below, BMW did not issue any engagement letters to any of the parties. Indeed, Mackey does not always discuss who his clients will or will not be when he sets up business entities. This lack of precision may be the reason why Lori Rundquist, the primary contact between the PEIs and the general partner, has made conflicting statements under oath as to whether BMW did or did not represent Atlas.

1123, LLC was formed to purchase a jet but the pre-purchase inspection of the jet revealed various shortcomings between the jet's described condition and the jet's actual condition. Because of this discrepancy, Jordan had BMW file suit on 1123, LLC's behalf on February 25, 1999. The suit sought rescission of the contract as well as the return of the $25,000 deposit for the jet that had been paid by one of Jordan's companies, Air Beau-Beau, LLC. Mackey was given a settlement offer by the defendants where the purchase agreement would be rescinded and the $25,000 deposit returned if 1123, LLC paid $4,300 in expenses incurred by the defendants. Mackey never told Jordan or anyone else affiliated with Atlas about this settlement

3

offer. Mackey simply informed the defendant's attorney that their offer was rejected. Ultimately, the case was settled on April 9, 1999 pursuant to a written agreement prepared by BMW wherein 1123, LLC agreed to dismiss its lawsuit, to pay for some of the jet's repairs, and to increase the purchase price of the jet from $525,000 to $545,000. Jordan then had Atlas send the $545,000 to 1123, LLC's account so he could close the transaction. Neither Jordan nor Mackey informed Atlas of the jet's problems, the lawsuit, or the settlement agreement. Mackey also did not inform Atlas of the initial settlement agreement that he rejected. Jordan was out of state at the time of the closing so Atlas relied upon BMW to represent their interests during the closing. If BMW had disclosed the defects and the existence of the first settlement agreement, Atlas would not have consummated the deal.

Once 1123, LLC acquired the jet, it invested hundreds of thousands of dollars in order to get the jet FAA certified. The jet never earned FAA certification, however, and Jordan was instructed to sell the jet by the Whitman family who was the majority investor in Atlas. The Whitmans, through accountant John S. Solon ("Solon"), advised Jordan by letter dated March 14, 2000 to liquidate the airplane investments in a manner that would maximize the selling prices. A similar letter was sent to Jordan on September 14, 2000 by Joseph G. Nicholas ("Nicholas") whose company, Nicolas Financial, Inc. was Atlas' general partner. Jordan informed BMW of the substance of both of these letters.

After garnering no interest for the jet through an airplane broker in Florida, Jordan enlisted the help of Donald King ("King"). Jordan and King ultimately decided to sell the parts of the 1123 jet for a Falcon 20 jet, which is a larger and more expensive aircraft, in a lease-purchase agreement. Jordan and King hoped to generate more income through that jet than the

1123 jet. BMW organized the entity Falcon 20, LLC and negotiated the terms of the lease agreement between Falcon 20, LLC and the original owner of the Falcon 20 jet. Jordan notified neither Atlas nor 1123, LLC of the Falcon 20 transaction. According to Jordan, Falcon 20, LLC never produced revenue.

The second PEI at issue in this case was the Breezy Mart convenience store ("Breezy Mart") which was located in Pittsylvania County on Route 58. BMW had originally organized Breezy Mart for three outside investors. This investment was filled with organizational and operational problems of which Mackey was aware. When the investor who was contributing the majority of the capital for the Breezy Mart's construction backed out of the deal, Mackey approached Jordan and suggested that the Breezy Mart might be of interest to him. Jordan ultimately invested $750,000 of Atlas' funds into the Breezy Mart. BMW organized two new entities in connection with the Breezy Mart. Breezy Mart, LLC would operate the convenience store while 58 West Associates, LLC would own the real property. Indeed, during his deposition, Mackey made what is arguably an admission that BMW represented Atlas at least on some level during the closing of the loan associated with this PEI. The Breezy Mart ultimately failed due to the operational problems known to Mackey. Atlas was forced to foreclose on the real estate and obtained ownership of the Breezy Mart via a credit bid. When Breezy Mart, LLC did not pay its legal bills to BMW, BMW told Jordan that Atlas should pay for them. This would have been in keeping with Atlas' practice of indirectly paying for BMW's legal fees, according to Jordan.

In a related business venture, Jordan invested $100,000 of Atlas' funds in an eight acre parcel of land adjacent to the Breezy Mart location. Jordan and Mackey knew that this price was

5

too high and that the land might not be suitable for Jordan's intended use, but Jordan decided to buy it anyway. BMW prepared the deed of sale for Atlas' purchase on April 29, 1999.

The final PEI at issue in this case is Interwoven Technologies, Inc. ("Interwoven"). Interwoven was formed by Jordan through Fedd Credit and James Woodruff ("Woodruff"). Atlas invested $250,000 in the company. The stock subscription agreement drafted by BMW allotted Atlas 25,000 shares of Class A stock which was significantly smaller than other investors. For instance, Jordan and his wife invested $63,000 yet received 315,800 shares of Class A stock and 245,000 shares of Class B stock while the Whitman Children's Trust - for which Mackey was trustee - received 45,000 shares of Class A stock even though it invested no money in Interwoven. Atlas was not advised of the disproportionate stock distributions. Some time after Interwoven began its operations, Jordan discovered that Woodruff had failed to perform his promised work, had not been awarded a contract that he had purported to have received, and was selling stock to unaccredited investors and keeping the money for himself. Jordan gave this information to Mackey who, in turn, advised Jordan to contact a former FBI agent and forensic accountant to perform an audit of Interwoven. As a result of the audit, the FBI raided Interwoven, thereby shutting down its operations for a substantial period of time.

In the aftermath of the FBI raid, Fedd Credit sued Interwoven and its affiliate, Interwoven Electronics, to enforce loans that Fedd Credit had made to them. One of the loans to Interwoven Electronics was signed by Jordan on behalf of both the buyer - Interwoven Electronics - and the seller, Fedd Credit. Even though BMW had represented Interwoven in its formation, BMW and Black represented Fedd Credit in its suit against Interwoven. Jordan was

6

paid $100,000 as a result of the suit which was eventually settled in a document prepared by BMW. Jordan and BMW did not disclose Jordan's problems with Woodruff to Atlas, nor did they disclose their discussions with the FBI that led to the raid.

## III.  PROCEDURAL HISTORY

This case was originally brought as a Chapter 11 bankruptcy case in the United States District Court for the Western District of Virginia, Lynchburg Division in June, 2002. Plaintiffs initiated this adversary proceeding in bankruptcy court by filing their Complaint on June 4, 2003. Originally, the defendants in this case were all partners in Atlas: Jordan, Fedd Credit, Jeffrey Hopprich ("Hopprich"), the managing member of 1123, LLC, BMW, and Black.  By November 24, 2004, the bankruptcy court had either approved settlement or dismissed claims against all but the two current Defendants.  With regard to these remaining Defendants, Plaintiffs' claims stem from an allegation that Defendants had a duty to disclose material information to Plaintiffs.  This duty arose, according to Plaintiffs, because an attorney-client relationship between the parties existed with regard to the failed PEIs made by Plaintiffs through Jordan.

On January 3, 2005 this Court withdrew the reference to the bankruptcy court.  Plaintiffs filed their Second Amended Complaint on June 10, 2005.  This complaint removed certain claims and factual allegations that were not applicable to Defendants.  Also on June 10, 2005 this Court entered an order incorporating pre-existing discovery testimony and documents obtained pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure during the bankruptcy case. The Second Amended Complaint has five counts: (1) Breach of Contract; (2) Breach of Fiduciary Duty; (3) Legal Malpractice; (4) Fraud; and (5) Business Conspiracy under Va. Code §§ 18.2-499 and -500.   Defendants filed their Answer on June 27, 2005 and filed their Motion

for Summary Judgment on August 24, 2005. After receiving an extension of time to file their Brief in Opposition to Summary Judgment, Plaintiffs filed their Brief on October 21, 2005. Defendants filed a Reply Brief on November 4, 2005. The parties were heard at oral argument before this Court on December 2, 2005, making the matter now ripe for decision.

## IV. DISCUSSION

The facts discussed above reveal a series of failed investments made by Jordan on behalf of Atlas. The facts also reveal that BMW performed legal services to varying degrees in the furtherance of these investments. The ultimate questions are whether BMW and Atlas formed an implied attorney-client relationship with each other during the time these investments were made and, if so, whether BMW breached any duties it owed to Atlas that arose from that relationship. For the reasons that follow, I believe that there are genuine issues of material fact to allow Counts I and V to proceed to trial. I will discuss each Count in turn.

### A. Count I: Breach of Contract

In their Second Amended Complaint, Plaintiffs allege that Defendants breached the contractual duties they owed to Plaintiffs. The duty alleged is the duty to provide competent legal services related to Defendants' work on Plaintiffs' PEIs. Defendants argue in their briefs that no such attorney-client relationship ever existed and, as such, Defendants never owed a duty to Plaintiffs. While Defendants acknowledge that they had attorney-client relationships with Jordan and the various entities that they helped form, they maintain that these relationships did not create an additional attorney-client relationship between it and Atlas. Alternatively, Defendants argue that even if they did owe a duty to Plaintiffs, they did not breach that duty.

An attorney-client relationship may be either expressly or impliedly created. *Nicholson v. Shockey*, 192 Va. 270, 277 (1951). The Virginia Supreme Court has long held that "an attorney may be employed without formalities of any kind. The contract...is often largely implied from the acts of the parties." *Glenn v. Hayes*, 102 Va. 574, 580 (1951). Whether express or implied, "some indication that the advice and assistance of the attorney was sought and received is integral to the creation of the attorney-client relationship." *Carstensen v. Chrisland Corp.*, 247 Va. 433 (1994) (citing *Nicholson*, 192 Va. at 277). In other words, there must be something more than the subjective beliefs and conclusory allegations by the client to prove the existence of an attorney-client relationship.

In this case, and keeping in mind the applicable summary judgment standards, there is more evidence than the mere subjective beliefs and conclusory allegations made by Plaintiffs to support their claim that an attorney-client relationship existed. First of all, there is substantial evidence to show that BMW was the only law firm consulted in the PEI transactions. Similarly, there is evidence that BMW represented multiple entities in many of these transactions. Moreover, there is evidence that Mackey, and perhaps other BMW lawyers, neither issued engagement letters nor discussed conflict of interest issues even with entities that it admits to have represented. This could explain why Lori Rundquist has made conflicting statements in a deposition and an affidavit regarding whether BMW represented Atlas. This alone appears to create a genuine issue of material fact concerning the conduct that would prove or disprove the existence of an attorney-client relationship.

In addition to this, other pieces of objective evidence exist which lend support to Plaintiffs' argument that summary judgment is inappropriate. For instance, Plaintiffs have put

9

forth evidence that BMW, by Mackey, both had a duty and breached that duty to 1123, LLC. This was done by failing to inform 1123, LLC of the jet's deficiencies, the existence of the first settlement offer, and by actively working against the known directive that Atlas made to Jordan to liquidate the jet assets; that is, not to purchase the more expensive Falcon 20 jet. As concerns the other PEIs, Mackey has suggested in his deposition that he may have had at least a limited attorney-client relationship with Atlas during the Breezy Mart transaction. Likewise, in the Interwoven transaction, there again is evidence that BMW knew that the LLC was being formed purportedly for the benefit of Atlas' investors, yet it set up a stock subscription agreement that appears to benefit Jordan and Mackey to the detriment of Atlas. Lastly, there is evidence that Defendants knew Plaintiffs were paying for their services via their agent, Jordan. While an attorney-client relationship is not "dependent on the payment of fees," when viewed with the other pieces of evidence which show that BMW knew Jordan was acting on Atlas' behalf, it suggests that BMW knew that it was representing Atlas as well as Jordan and the PEIs. *Glenn*, 192 Va. at 580. Taken together, all the above evidence presents a triable issue for all elements necessary to prove Plaintiffs' breach of contract claim.

Defendants strenuously argue that while they may have represented Jordan and the PEI entities, such representation does not mean that they also represented Atlas. To support their argument, Defendants cite a list of cases from other circuits and a case from the Fourth Circuit that was decided under Texas law. *See*, *e.g.*, *Rhode Island Depositors Economic Protection Corp., v. Hayes*, 64 F.3d 22 (1st Cir. 1995); *Fortson v. Winstead, McGuire, Sechrest & Minick*, 961 F.2d 469 (4th Cir. 1992); and *Sheinkopf v. Stone*, 927 F.2d 1259 (1st Cir. 1991). Defendants' reliance on these cases for their summary judgment motion, however, is flawed.

10

First of all, none of the cases cited by Defendants is factually analogous to the present case and none were decided under Virginia law. I am therefore not bound by their rulings. Second, even though the reasoning behind many of Defendants' cases are persuasive at first glance, none of them contain enough of the facts relevant to the motion here for me to apply their holdings to this case. Indeed, in *Fortson* and *Hayes*, there was no dispute as to who was and was not the attorneys' clients. This is the crux of the litigation in the present case. This critical factual inconsistency between Defendants' cases and the present case militate against entering summary judgment.

I will next consider Defendants' argument that, to the extent they had an attorney-client relationship with Atlas, they did not breach any duties that arose from the relationship. The question of breach is fact-specific and requires the weighing of evidence and determinations of credibility, both of which are more appropriately resolved by a jury than a judge. However, for summary judgment not to enter, I must find that there is a genuine issue of material fact such that a reasonable jury could ultimately find in Plaintiffs' favor. There is evidence to support a finding of breach in this case. For instance, Plaintiffs have presented evidence that Defendants often represented multiple parties in a single PEI transaction, Mackey failed to disclose the existence of the first settlement offer in the 1123, LLC litigation, and BMW did not act with reasonable care in identifying who its clients were. These facts alone would allow a reasonable jury to find for Plaintiffs, thus making summary judgment inappropriate.

By combining these deficiencies in their cited cases with the fact that Defendants ignored the above-listed objective evidence, there is support for Plaintiffs' argument that an attorney-client relationship existed and a reasonable jury could find that Defendants breached their duties

11

to Plaintiffs which arose from that relationship. It should be noted that I have not relied on either the affidavits of Edward B. Lowry or Thomas E. Albro in reaching my decision. Fed. R. Civ. P. Rule 56(e) requires that all affidavits be based on personal knowledge. Both of these affidavits, however, base their conclusions on a set of hypothetical facts given to the affiants by Plaintiffs. Since neither affidavit could have been made without Plaintiffs supplying their own version of the facts in this case, the affidavits do not meet the standard of Rule 56(e). Similarly, I have disregarded Plaintiffs' argument that Defendants' violated the Rules of Professional Conduct as a basis for surviving summary judgment. Such a violation does not "provide a basis for private causes of action." *Carter v. Williams*, 246 Va. 53, 60 (1993).

Because there are genuine issues of material fact that support Plaintiffs' allegation that Defendants breached the contract that arose out of their attorney-client relationship, Defendants' Motion for Summary Judgment as to Count I is **DENIED.**

### B. Counts II, III, and IV: Breach of Fiduciary Duty, Legal Malpractice, and Fraud

The decisions of the Virginia Supreme Court mandate that summary judgment be granted as to Counts II, III, and IV of Plaintiffs' Second Amended Complaint. The Virginia Supreme Court has long held that "an action for the negligence of an attorney in the performance of professional services, while sounding in tort, is an action for breach of contract." *Oleyar v. Kerr*, 217 Va. 88, 90 (1976). This is because it is implicit in the attorney's contract with his client that he will "exercise a reasonable degree of care, skill, and dispatch in carrying out the business for which he is employed." *Ortiz v. Barrett*, 222 Va. 118, 126 (1981). Therefore, in the absence of an independent, common law tort, other causes of action that allege the tortious breach of an attorney's contract for legal services are redundant and must be dismissed. *O'Connell v. Bean*,

12

263 Va. 176, 181 (2002).

In Counts II, III, and IV of their Second Amended Complaint, Plaintiffs have alleged a breach of fiduciary duty, legal malpractice, and fraud. These are exactly the types of claims that the Virginia Supreme Court has unequivocally stated must be dismissed. In *O'Connell*, the Virginia Supreme Court dismissed the plaintiff's breach of fiduciary duty and constructive fraud claims using the above-discussed rationale. *Id*. Plaintiffs' claim of legal malpractice must likewise be dismissed for the plain reason that any duty Defendants had to perform legal services must have arisen solely by virtue of an attorney-client contract. Therefore this is also redundant of Plaintiffs' breach of contract claim alleged in Count I. *See, General Sec. Ins. Co. v. Jordan, Coyne & Savits, LLP*, 951 F.Supp. 2d (E.D. Va. 2005); *Hewlette v. Hovis*, 318 F.Supp. 2d 332, 335 (E.D. Va. 2004) (applying Virginia law to dismiss legal malpractice and breach of fiduciary duty claims).

Lastly, Defendants have cited to *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc*., 256 Va. 553 (1998) in order to show that the actual fraud portion of Plaintiffs' Count IV should also be dismissed as duplicative of the breach of contract claim. This argument has merit. In describing Count IV of their Complaint, Plaintiffs allege that Defendants committed fraud by failing to disclose all material facts during the course of Defendants' alleged representation of Plaintiffs. Plaintiffs argue in Paragraph 83 of their Second Amended Complaint that they relied to their detriment on these "omissions." There does not seem to be any doubt that, absent the purported attorney-client relationship, Defendants would have been under no duty to reveal anything to Plaintiffs. As *McDevitt* states, "the source of any duty breached in this case is solely from the [attorney-client] contract between the parties." 256 Va. at 559. The Fourth Circuit has

13

held that *McDevitt* is "consistent with the distinction in Virginia law between a statement that is false when made (which is fraud) and a promise that becomes false only when the promisor later fails to keep his word (which is breach of contract)." *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614 (4th Cir. 1999).

In this case, Plaintiffs are alleging that Defendants failed to disclose material facts of which Defendants became aware during the course of the attorney-client relationship. Plaintiffs are not alleging that Defendants committed malfeasance at all, merely nonfeasance. *McDevitt* holds that in this circumstance, alleged fraudulent acts of nonfeasance are simply redundant of breach of contract claims while alleged fraudulent acts of misfeasance are capable of being independent fraud claims that could co-exist with a breach of contract claim. *See, Insteel Indus. Inc. v. Costanza Contracting Co., Inc.*, 276 F.Supp 2d 479, 485 (E.D.Va 2003). Based on these precedents from the Virginia Supreme Court and the Fourth Circuit, it is proper to grant summary judgment to Defendants on the actual fraud portion of Count IV of Plaintiffs' Complaint.

In an attempt to distinguish their case from the clear holdings of Virginia law, Plaintiffs argue that Defendants did owe them a common law duty. This duty was one of agency as alleged in Paragraph 72 of Plaintiffs' Second Amended Complaint. This independent tort would be a separate and sufficient basis for Plaintiffs. To support this argument, Plaintiffs state that Defendants had a "relationship" with them that was independent of the Defendants' "representation" of them. This distinction seems to be an exercise in semantics. Though Plaintiffs alleged a "representation and relationship" with Defendants, there is no evidence that this relationship came from anywhere but the purportedly contractual representation of Plaintiffs

14

by Defendants. As Defendants state, even if Jordan did engage them to provide legal services for the benefit of Plaintiffs, this agency relationship arose out of the attorney-client contract. Indeed, in the *O'Connell* opinion itself, the Virginia Supreme Court referred to "duties...[that] arose from the attorney-client *relationship*" and not from the attorney-client 'representation.' *Id.* (emphasis added). There seems to be no basis to distinguish between the words 'representation' and 'relationship' for purposes of this analysis.

Lastly, it must be noted that Counts II, III, and IV must be dismissed regardless of whether there actually was a breach of contract. If there was a breach of contract, then Counts II, III, and IV must be dismissed as redundant as discussed above. By the same token, if there was no breach of contract, then Counts II, III, and IV must be dismissed because they stand on the same factual and legal footing as Plaintiffs' Breach of Contract claim. Therefore, Defendants' Motion for Summary Judgment as to Counts II, III, and IV is **GRANTED.**

### C. Count V - Business Conspiracy Under Va. Code §§ 18.2-499 and -500

Under Va. Code §§ 18.2-499 and -500, Plaintiffs may only recover for business conspiracy if they prove by clear and convincing evidence that (1) a combination of two or more persons; (2) acted for the purpose of willful and malicious injury to Plaintiffs by any means whatever; and (3) that act resulted in damage to Plaintiffs. *See,* Va. Code § 18.2-500; *Tazewell Oil Co. Inc. v. United Va. Bank*, 243 Va. 94 (1992). To prove malice, Plaintiffs must show that Defendants acted intentionally, purposefully, and without legal justification. *Commercial Bus. Systems v. Bell South*, 249 Va. 39, 47 (1995). Significantly, the statute does "not require a plaintiff to prove that a conspirator's primary and overriding purpose is to injure another in his trade or business." *Id.*

15

Taking the above recited facts from Section II in the light most favorable to Plaintiffs, Defendants' and Jordan's actions constitute a prima facie case of business conspiracy. Such examples are Defendants' and Jordan's structure of the 1123, LLC settlement agreement, the purchase of the Falcon 20 jet, the purchase of the eight acre parcel next to the Breezy Mart, and Interwoven's Stock Subscription Agreement. These actions are all evidence that Defendants and Jordan worked together to damage Plaintiffs. That damaging Plaintiffs may not have been their primary purpose is immaterial under Virginia law.

Thus, for the myriad allegations put forth alleging that Defendants and Jordan acted to harm Plaintiffs' business interests, I find that Plaintiffs have put forth enough evidence to survive summary judgment as to Count V. Therefore, Defendants' Motion for Summary Judgment as to Count V is **DENIED.**

## V. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

The Clerk is directed to send a certified copy of this Memorandum Opinion and the attached Order to all counsel of record.

ENTERED this 6th day of January, 2006.

s/Jackson L. Kiser
Senior United States District Judge